```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  RONG FAN,

 4                        Plaintiff(s),

 5                                    24 CV 2198 (CS)
         -vs-
 6                                    BENCH RULING

 7  WESTCHESTER MEDICAL ENTER ADVANCED
    PHYSICIAN SERVICES, P.C.,
 8
                        Defendant(s).
 9  ------------------------------------x

10                            United States Courthouse
                              White Plains, New York
11
                              Thursday, June 26, 2025
12                            10:15 a.m.

13
    Before:  THE HONORABLE CATHY SEIBEL,
14                    United States District Judge

15

16  A P P E A R A N C E S:

17

    VALIANT LAW
18       Attorneys for Plaintiff
    BY:  JOSEPH JEZIORKOWSKI
19

20  JACKSON LEWIS PC
         Attorneys for Defendant
21  BY:  DANIEL D. SCHUDROFF
         SYDNEY MENDELSOHN
22

23  BARBARA KUKOWSKI
         Deputy General Counsel for WMD Health
24

25
```

1          THE DEPUTY CLERK:  All rise.  The Honorable Cathy

2    Seibel presiding.  Fan v. Westchester Medical Center Advanced

3    Physicians.

4          THE COURT:  Good morning, Mr...Jeziorkowski?  Am I

5    saying it right?

6          MR. JEZIORKOWSKI:  Yes, your Honor.  Good morning.

7          THE COURT:  Good morning, Mr. Schudroff.

8          MR. SCHUDROFF:  Good morning, your Honor.

9          THE COURT:  Ms. Mendelsohn.

10         MS. MENDELSOHN:  Good morning.

11         THE COURT:  Ms. Kukowski.  Everyone can have a seat.

12         I'm prepared to rule on the motion.  Anybody have

13   anything to add that's not covered by the papers?

14         MR. SCHUDROFF:  No, your Honor.

15         MR. JEZIORKOWSKI:  No, your Honor.  Thank you.

16         THE COURT:  All right.

17         This is going to take a while.  Somehow, even though

18   it's a single-defendant employment case, it raised a slew of

19   issues, so you're going to want to plan to buy the transcript or

20   you're going to want to take detailed notes, because I will tell

21   you, the motion is going to be granted in part and denied in

22   part, so you need to know the details because they're going to

23   govern how we're going forward.

24         For purposes of Defendant's motion to dismiss, I

25   accept as true the facts, although not the conclusions, set

1  forth in the Amended Complaint, which I'm going to call the

2  "AC," which is at ECF no. 21.  Those facts are as follows.

3          In or around July 21, Plaintiff, Rong Fan, was

4  recruited by Defendants, Westchester Medical Center Advanced

5  Physician Services PC, which I'm just going to call "PC";

6  Westchester County Health Care Corporation, d/b/a Westchester

7  Medical Center Health Network, which I'm going to call "HCC";

8  and Dr. Humayun Islam; and he was offered a position as an

9  attending physician at Westchester Medical Center Valhalla,

10  which I'm going to call "WMC."  See ¶¶ 4 and 25, and also ECF

11  no. 25-1, which is the agreement Plaintiff ultimately entered,

12  at pages 1-2, and citations to the Agreement use the page

13  numbers generated by the Court's Electronic Case Filing system.

14          During the negotiations surrounding his employment,

15  Plaintiff made it clear to Defendants that he would only

16  practice within his subspecialty of pediatric pathology, and his

17  initial salary offer was reduced in consideration for this

18  limitation to his practice.  Plaintiff and PC signed his

19  employment agreement on July 1, 2021, (*see* the Agreement at 11),

20  and Plaintiff began work in October 2021.  (¶¶ 25-28.)

21          Shortly after he began his employment, Defendants

22  began assigning Plaintiff adult pathology cases.  Plaintiff

23  refused and told Defendants that, A, it was a breach of his

24  contract, which, according to Plaintiff, stated that Plaintiff

25  was only to work on pediatric cases, and, B, it presented

1  serious risks to patient health and safety.  Defendants then

2  assigned Plaintiff to an increased call volume and Dr. Islam

3  placed Plaintiff on 24/7 call.  Defendants also prevented

4  Plaintiff from taking a meal break on one occasion, as Dr. Islam

5  e-mailed Plaintiff to "come back and do your frozen," (¶ 38)

6  apparently, a reference to a frozen section, which I understand

7  to be a procedure for analyzing tissue during a surgery.  (¶¶ 35

8  and 38.)

9          At some point during Plaintiff's employment, Plaintiff

10 noticed that the autopsy suite was disorganized and unsanitary.

11 He complained about these considerations to Dr. Islam, but Dr.

12 Islam balked at his concerns.  Plaintiff also complained to Dr.

13 Islam about the residency program at WMC, noting "serious

14 deficiencies" with the program, including poor treatment of the

15 residents and the unsanitary working conditions.  Dr. Islam

16 again dismissed Plaintiff's complaints, instructing him not to

17 concern himself with the residency program.  (¶¶ 36 and 37.)

18         Dr. Islam continued to direct Plaintiff to perform

19 adult cases with which Plaintiff was "unfamiliar and

20 uncomfortable."  (¶ 40.)  Although he agreed to perform limited

21 parts of adult pathology with which he had some experience, he

22 also continued to stress that he could not take risks to

23 jeopardize the safety of patients or the quality of his work and

24 warned Dr. Islam that when physicians depart from their area of

25 competence, the consequences could be dire.  (¶¶ 40-42.)  On

1  August 26th, 2022, Plaintiff e-mailed Dr. Islam about this

2  issue, stating, "I have my limitations and temperament, and

3  dignity cannot be further compromised."  (¶ 45.)  Despite these

4  complaints, Dr. Islam continued to insist Plaintiff take on the

5  duties of a full-time adult pathologist while also performing

6  pediatric pathology and supervising a junior pediatric

7  pathologist.  He also directed Plaintiff to release a frozen

8  microbiology case remotely despite Plaintiff's protests that he

9  had not yet formed a sound judgment.  (¶¶ 43 and 46.)

10          On November 17th, 2022, Plaintiff e-mailed Dr. Islam

11  again, this time about his bonus, which he had not yet received.

12  In his e-mail, Plaintiff stated, "I have been here for more than

13  one year.  I am still waiting for my annual bonus check.  I am

14  sure you will take care of it, but please confirm.  Thank you."

15  Dr. Islam did not respond, so Plaintiff e-mailed him again on

16  December 19th, 2022.  In early January 2023, Plaintiff and Dr.

17  Islam met to discuss the bonus, and Dr. Islam agreed Plaintiff

18  was entitled to the full amount.  Despite this agreement,

19  Plaintiff still did not receive his bonus and continued to

20  follow up with Dr. Islam about it as late as June 2023.  (¶¶ 47

21  and 59.)

22          On January 11th, 2023, Plaintiff e-mailed Dr. Islam

23  about his assignment to adult cases, stating, "as a pediatric

24  pathologist, I don't feel comfortable covering adult frozen

25  sections."  He did offer to help in rare circumstances, but

1  argued that routine involvement would require him to keep up on

2  adult pathology knowledge and would be unfair to the adult

3  patients in the medical center as more qualified pathologists

4  were available to them.  He also shared this e-mail with Chief

5  of Service Michael Gewitz, explaining that Dr. Islam was

6  pressuring him to work outside his specialty and outside his

7  contract, which would compromise his pediatric pathology

8  service.  (¶ 48.)

9           On April 25th, 2023, Plaintiff got sick and asked to

10  use his protected leave due to his illness, as well as

11  clarification of his sick time.  The AC does not say what

12  happened as a result.  In June of 2023, when Plaintiff returned

13  from vacation, he learned he had been dropped from the regular

14  surgical pediatric autopsy schedule and was put only on autopsy

15  service, resulting in case assignments to him becoming

16  irregular.  At this time, he was also tasked with supervising a

17  new hire for pediatric pathology as opposed to practicing on his

18  own.  As a result of his assignment to perform autopsy work and

19  supervision, Plaintiff's ability to receive Relative Value

20  Units, or RVUs, was hindered, which would affect his

21  compensation.  In fact, his RVUs dropped close to zero, which

22  severely affected his performance metrics.  Plaintiff felt

23  forced to agree to take on adult cases to continue his

24  employment.  (¶¶ 50-55.)

25           Additionally, at some point during his employment, he

1 requested time off to visit his elderly parents in China.  Dr.

2 Islam spent months sitting on Plaintiff's request such that he

3 was unable to plan his trip.  He also denied Plaintiff's routine

4 requests for days off and instructed Plaintiff to submit

5 requests one month in advance.  He did not require the same from

6 other employees and did not deny or delay vacation requests,

7 even for international travel, for those who did not raise

8 issues and complaints as Plaintiff had.  (¶ 56.)

9           On or about June 29th, 2023, Plaintiff met with

10 Associate Director Dr. Dewar and one of Plaintiff's managers

11 regarding his assignment to adult cases.  At this meeting, Dr.

12 Dewar became aggressive with Plaintiff and pushed Plaintiff out

13 of his office.  That same day, Dr. Islam again e-mailed

14 Plaintiff directing him to practice adult pathology, to which

15 Plaintiff replied he did not consent.  The next day on June

16 30th, 2023, Plaintiff memorialized his complaints in an e-mail,

17 stating that he was being pressured to carry out duties beyond

18 his comfort zone.  (¶¶ 57-59.)

19           About two weeks later, on July 12th, Plaintiff ran

20 into a candidate who was at the hospital for an interview.  When

21 the candidate asked Plaintiff why the previous pathologist left,

22 Plaintiff began to explain the teaching load to the candidate.

23 Dr. Islam interrupted the conversation, led the candidate away,

24 and then returned and threatened Plaintiff, stating "this place

25 is not for you."  When Plaintiff responded that he was obligated

1  to tell candidates the truth, Dr. Islam replied, "that is the

2  reason I don't want you to be here."  The Complaint says, "I

3  don't want you to here," but I think it means either I don't

4  want you here or I don't want you to be here.  (¶ 60.)

5            On July 14th 2023, Plaintiff e-mailed the Vice

6  President of Professional Support Services about the "unlawful

7  conduct, hostile work environment, and retaliation," but did not

8  receive any help.  He then e-mailed Dr. Gewitz on July 31st

9  complaining about "the fundamental disagreement" between

10 Plaintiff and Dr. Islam and asking to speak with Dr. Gewitz.  He

11 was fired the same day.  (¶¶ 61-63.)

12           Plaintiff filed his Complaint on March 22nd of last

13 year.  On June 4th, Defendants requested a pre-motion conference

14 in anticipation of their motion to dismiss.  We had a conference

15 on July 2nd.  I granted Plaintiff leave to amend.  Plaintiff

16 filed the AC on July 23rd asserting the claims for breach of

17 contract, as well as retaliation, under New York Labor Law §§

18 215, 740 and 741.

19           The legal standards governing this motion are well

20 settled.  The standards governing a motion under Rule 12(b)(1)

21 for lack of subject matter jurisdiction should require no

22 citation and therefore, I'm going to skip the citations and just

23 summarize the well-settled Supreme Court and Second Circuit law,

24 providing that a federal court has subject matter jurisdiction

25 over a cause of action only when it has authority to adjudicate

Bench Ruling                    Fan v. WMC

1  the cause pressed in the complaint.

2          Determining the existence of subject matter

3  jurisdiction is a threshold inquiry.  The Court must dismiss

4  when it lacks the statutory or constitutional power to

5  adjudicate the claim.  The parties asserting jurisdiction bears

6  the burden of showing by a preponderance of the evidence that

7  subject matter exists.  I can look outside the pleading

8  standards in making this determination.  I have to consider the

9  facts in the Complaint as true and draw all reasonable

10 inferences in favor of Plaintiff, but jurisdiction has to be

11 shown affirmatively, and it's not sufficient -- that showing's

12 not made by drawing inferences favorable to the party asserting

13 it.  When parties move to dismiss both for lack of subject

14 matter jurisdiction and on other grounds, I have to address

15 subject matter jurisdiction first.

16         I'm also not going to take much time to elaborate on

17 the standard governing motions to dismiss for failure to state a

18 claim under Rule 12(b)(6).  We should all be familiar with the

19 plausibility standard of *Bell Atlantic v. Twombly*, 550 U.S. 544,

20 and *Ashcroft v. Iqbal*, 556 U.S. 662.

21         I'm also not going to take the time to elaborate on

22 the case law describing what documents beyond the pleadings can

23 be considered on a motion to dismiss under Rule 12(b)(6).

24 Obviously, I can consider the employment contract in connection

25 with the breach of contract claim.  I can also consider it in

1  connection with the Labor Law claims because Plaintiff relies on

2  it and its terms for those claims and thus, it is integral to

3  the Complaint.

4        I'll start with the breach of contract claim.

5        Defendants argue that neither HCC nor Dr. Islam were

6  parties to the employment agreement between Plaintiff and PC and

7  thus, the breach of contract claim should be dismissed as to

8  them.  (*See* Defendant's Memorandum, which is ECF no. 23, at

9  pages 10-11.)  Plaintiff argues that although HCC and Islam did

10 not sign the contract, they can be liable for breach as they

11 manifested an intent to be bound.  That's in Plaintiff's

12 Opposition, ECF no. 27, at 18-20.

13       "In general, a party who is not a signatory to the

14 contract cannot be held liable for breaches of that contract."

15 *Chemimage Corp. v. Johnson & Johnson*, 2024 WL 3758814, at *3

16 (S.D.N.Y. Aug. 12th, 2024).

17       And, by the way, any case quotations today omit

18 alterations, footnotes, internal quotation marks, and citations

19 unless I say otherwise.

20       That a non-signer can't be held liable is true even

21 when the non-signer is the corporate parent of the signer, as

22 corporate parents and subsidiaries are legally distinct entities

23 and a contract under the corporate name of one is not treated as

24 a contract of both.  *Chemimage*, 3.  The same is true for

25 corporate affiliates.  *See Alaska Electric Pension Fund v. Bank*

1  *of America*, 306 F.3d 610, 624.  Nevertheless, a non-signer can

2  be held liable for breach where it manifests an intent to be

3  bound, and courts have found that a non-signatory manifested an

4  unequivocal intent to be bound where the non-signer was the key

5  decision-maker in contract negotiations where it attended

6  meetings and participated in the negotiations and drafting of

7  the contract, or where it micromanaged performance under the

8  contract.  *Chemimage,* *3; *see Alaska Electric*, 625.

9          HCC is not plausibly a party to the contract.  Where

10  courts have found intent based on participation in contract

11  negotiations, the complaint detailed the non-signatory's role in

12  the negotiations showing active participation.  *See Chemimage*

13  *Corp.,* *4, finding that the plaintiff barely stated a claim

14  against the non-signatory where the complaint alleged that

15  high-level employees of that defendant were involved in

16  negotiating and approving the contract, that defendant had

17  ultimate decision-making authority over the signer, defendant

18  approved the contract, defendant negotiated for a specific

19  provision that all communications regarding the contract were to

20  be sent to defendant's office, defendant was involved in

21  performance of the contract after it was signed, and the

22  signatory terminated the agreement at the defendant's direction;

23  *Jennings v. Hunt,* 367 F. Supp. 3d 66, 71-72 (S.D.N.Y. 2019),

24  where the complaint pleaded that during the negotiations,

25  officers of the non-signatory defendant conducted intense

1  negotiations over the terms of the contract and assured

2  plaintiff that defendant would provide plaintiff with whatever

3  resources plaintiff needed, and that defendant's general counsel

4  was the one who sent the draft agreement to the plaintiff; and

5  *TransformaCon v. Vista,* 2015 WL 4461769, at *5 (S.D.N.Y. Jul.

6  21st, 2015), where the plaintiff alleged that senior executives

7  of the non-signatory defendant reviewed and approved various

8  aspects of the contract and plaintiff continued to directly

9  communicate with the defendant after the agreement was signed,

10 which sufficed along with the allegation that the signer agreed

11 to the contract under the defendant's watch and control.

12          Here, Plaintiff's AC contains nothing of the sort.

13 Plaintiff merely alleges on information and belief that all

14 Defendants were involved in the negotiations.  (¶ 29.)

15 Plaintiff does not explain what any of the Defendants said or

16 did individually during these negotiations, does not allege that

17 HCC in particular approved the contract, and does not allege

18 that PC acted at HCC's direction or any other fact that would

19 show that HCC was a key decision-maker in the negotiations.

20 Indeed, pleading participation in negotiations on information

21 and belief is particularly puzzling because presumably Plaintiff

22 would know with whom he negotiated.

23          Further, the cases in which non-signatory corporate

24 affiliates are found to be parties are distinguishable because

25 in those cases, plaintiff typically alleges more than just their

1  participation in negotiations.  For instance, the allegations

2  with respect to the negotiations are usually coupled with other

3  allegations about the specifics of the relationship between the

4  subsidiary and the parent.  *See Jennings*, 71, which found the

5  allegation sufficient to show that the non-signatory defendant

6  manifested an intent to be bound where the complaint pleaded

7  that the signatory was Defendant's wholly-owned subsidiary,

8  which had been formed to serve as parent entity of the then

9  shell broker-dealer arm of the defendant.  *See also Alaska*

10  *Electric*, 625, finding that plaintiff did not successfully plead

11  a non-signer's intent to be bound where the complaint only

12  alleged a "close relationship" between two companies and that

13  they shared identical management teams and executive offices.

14          Again, there are no such allegations in the AC here,

15  and the Agreement itself supports the position that HCC was not

16  a party.  The Agreement was only signed by PC, only PC had the

17  power to terminate Plaintiff, Plaintiff was defined in the

18  Agreement as an employee of PC.  (*See* the Agreement at 1, 7, and

19  11.)  *Also, see Financial Technology Partners v. Circle*

20  *Internet*, 2024 WL 4817473, at *5 (S.D.N.Y. Nov. 18th, 2024),

21  finding nothing in the agreement linked the defendants to

22  managing plaintiff's performance where the agreement specified

23  that only the signer, not the non-signer, could terminate

24  plaintiff's employment.  To the extent that HCC is mentioned,

25  it's referred to in the Agreement as the "Network," that, at

1   best, might show that it is an intended beneficiary, (*see* the

2   Agreement at 5 and at 8-9), providing that Plaintiff could not

3   testify adversely to any network entity in a capacity as an

4   expert, and a non-compete clause, providing Plaintiff was not to

5   induce patients of any network entity to patronize a competing

6   entity.  While the status of intended third-party beneficiary

7   gives that person the right to sue, it does not give others the

8   right to sue that person on the contract.  *International Customs*

9   *v. Ford,* 893 F. Supp. 1251, 1256, n.3 (S.D.N.Y. 1995).

10              Plaintiff adds facts about the relationship between

11  the two companies in his Opposition Brief.  First, he says,

12  "WMCHN and its affiliated corporations are under the exclusive

13  management and control of their parent company," meaning HCC.

14  That's in Plaintiff's Opposition at 18.  I cannot follow this

15  allegation because Plaintiff defines WMCHN as the Westchester

16  Medical Center Health Network, which he is suing as a d/b/a of

17  the Westchester County HCC.  I do not understand how a company

18  can be said to be under the control of its d/b/a.  Plaintiff's

19  Opposition also says that "the signatory of the agreement was

20  also an employee of WMC."  That's also in Plaintiff's Opposition

21  at 18.  Plaintiff defines WMC as consisting of PC and HCC, so

22  naturally, an employee of PC is an employee of WMC as Plaintiff

23  defines it, but that adds nothing to the analysis.  It does not

24  plausibly show that in signing as an employee of PC, that

25  individual, Mr. Rabinowitz, intended to bind HCC.  *See Buffalo*

1   *Xerographix v. Hartford Insurance Group*, 540 F. Supp. 3d 382,

2   392 (W.D. 2021), which found the parent company not bound by a

3   contract signed by an officer of both the parent and subsidiary

4   where the officer signed on behalf of the subsidiary.  In any

5   event, a party cannot amend his pleadings with new allegations

6   in a responsive brief.  *See, e.g., Alaska Electric*, 625.

7           Accordingly, Plaintiff has not sufficiently alleged

8   that HCC manifested an intent to be bound such that it could be

9   liable for breach, and the breach of contract claim as to HCC is

10  dismissed.

11          I'm not even sure what benefit keeping HCC in the case

12  would have for Plaintiff anyway, but that doesn't affect my

13  decision.

14          As for Dr. Islam, although the allegation that he

15  participated in the negotiations of the contract does not

16  suffice to show that he manifested an intent to be bound,

17  Plaintiff adequately alleges, and the Agreement shows, that Dr.

18  Islam micromanaged performance under the Agreement.  The

19  Agreement provides that Dr. Islam, as director, may request

20  Plaintiff to perform various duties and grants Dr. Islam the

21  "sole and exclusive discretion" to determine, review, and update

22  Plaintiff's performance metrics.  That's in the Agreement at 12.

23  It also, at pages 12 and 14, vests him with authority to direct

24  all administrative, supervision, resident, and teaching services

25  performed by Plaintiff.  Additionally, Plaintiff alleges

1  throughout the Complaint that Dr. Islam actually directed

2  Plaintiff's performance by assigning him various duties, telling

3  him how to handle certain cases, changing his work schedule, and

4  approving, or not, his time off.  (¶¶ 35, 38, 46, 52, 56, and

5  58.)

6          Accordingly, the AC plausibly alleges at this stage

7  that Dr. Islam manifested an intent to be bound through

8  micromanagement of Plaintiff's performance and therefore can be

9  liable for breach of contract.

10          Now, turning to the sufficiency of the pleading, at

11  the motion-to-dismiss stage where contract language is

12  ambiguous, courts should resolve any ambiguities in favor of the

13  plaintiff.  *Axiom Investment Advisors,* 234 F. Supp. 3d at 543.

14  A contract is ambiguous where a term could suggest more than one

15  meaning when viewed objectively by a reasonably intelligent

16  person who has examined the context of the entire integrated

17  agreement.  *Nevias v. Crystal Vision,* 2024 WL 3938262, at *4

18  (S.D.N.Y. Aug. 26th, 2024).

19          First, Plaintiff alleges that Defendants breached the

20  agreement by withholding Plaintiff's bonus, which Plaintiff

21  asserts was non-discretionary.  (*See* Plaintiff's Opposition at

22  21-23.)  Defendants argue the employment agreement unambiguously

23  vested complete discretion in Defendants to determine whether

24  Plaintiff would receive a bonus and thus, the claim for breach

25  on that basis fails.  That's Defendant's Brief at 15.

 1          "It is well established that an employee cannot
 2  recover for an employer's failure to pay a bonus under a plan
 3  that provides the employer with absolute discretion in deciding
 4  whether to pay the bonus."  *O'Grady v. BlueCrest,* 111 F. Supp.
 5  3d 494, 501 (S.D.N.Y. 2015).  The absolute nature of the
 6  employer's discretion is key.  Courts will not dismiss such
 7  claims even where the agreement vests an employer with some
 8  discretion as to whether a bonus will be paid and in what
 9  amount.  *See Ashmore v. CGI*, 2012 WL 2148899, at *8 (S.D.N.Y.
10  Jun. 12th, 2022), which denied a motion to dismiss where
11  defendant enjoyed "considerable leeway" as to the bonus, but the
12  contract did not make it unambiguously clear that the employer
13  had absolute discretion; and *Nevias*, 4, which said "retaining
14  some discretion regarding the amount and distribution of bonuses
15  does not on its own justify dismissal of a bonus claim."  Courts
16  dismiss breach of contract claims for this reason only when the
17  purely discretionary nature of the bonus decision is stated
18  unambiguously in the contractual documents.  *Ashmore*, 8.
19          The bonus clause in Plaintiff's agreement, which
20  appears at page 14, says, in relevant part:
21          "In addition to your other compensation, you shall be
22  eligible for a performance bonus of up to $15,000 per employment
23  year based upon your success in meeting the Performance Metrics
24  set forth above and in achieving a specific set of targets to be
25  established and documented in collaboration among you, the

1  Director and Leadership, at the beginning of each employment

2  year.  The Director and Leadership shall...determine the

3  specific amount of your performance bonus, if any, subject to

4  the approval of the CEO."

5          Defendants first argue that the inclusion of the words

6  "shall be eligible" demonstrates that Defendants had discretion

7  as to whether to award a bonus, but it is a plausible reading

8  that under the terms of the agreement, Plaintiff's eligibility

9  depended on whether he met the performance metrics.  "By linking

10 the receipt of a bonus to plaintiff's job performance...the

11 language quoted above...suggests that defendant's discretion was

12 constrained by the obligation to base the decision on whether to

13 award him a bonus and how much to award on his job performance."

14 *Ashmore*, 8; *see Nevias*, 5, which noted that the fact that the

15 agreement had concrete metrics from which bonuses would be

16 based, cut against a reading that Defendant had complete

17 discretion.  Because here, Defendant's discretion appears to be

18 constrained in this manner, it cannot be said Defendant's had

19 absolute discretion as necessary for dismissal.

20         Although there is a court in this District that has

21 found that language conditioning a bonus on an individual's

22 performance did clearly vest the employer with discretion to

23 award the bonus, *see Leschak v. Raiseworks,* 2016 WL 11695068, at

24 *5 (S.D.N.Y. Mar. 7th, 2016), in that case, there was no

25 indication that the agreement set out specific metrics that the

1  employee had to meet to get the bonus.  In other words, in the

2  absence of specific metrics, the employer would have had

3  discretion in evaluating the employee's performance without

4  being constrained by certain factors.  By contrast here, the

5  performance metrics were plausibly meant to guide Defendants,

6  thus limiting their discretion.  *See, e.g, Smith v. Railworks*,

7  2011 WL 2016293, at *4 (S.D.N.Y. May 17th, 2011).

8          Defendants also argue that the inclusion of the final

9  sentence of the bonus clause, and in particular the words "if

10  any," similarly vest Defendants with complete discretion.

11  That's in their Brief at 15.  But that sentence is plausibly

12  also ambiguous.  It could mean that even if Plaintiff met the

13  performance metrics, the director, leadership, or CEO could

14  still award nothing.  *See Culver v. Merrill Lynch,* 1995 WL

15  422203, at *3 (S.D.N.Y. Jul. 17th, 1995), which highlighted "if

16  any" as language that confers discretion, but as Plaintiff

17  suggests in his Opposition at 23, reading the bonus provision as

18  a whole, it's plausible that the words "if any" were included to

19  refer to the possibility that Plaintiff might not meet the

20  performance metrics outlined in the agreement and therefore

21  would not be entitled to a bonus at all.  *See Schiff v. ZM*

22  *Equity,* 2020 WL 5077712, at *6 (S.D.N.Y. Aug. 27th, 2020), which

23  noted that two provisions relating to a bonus have to be read

24  together to determine the meaning.  Thus, the language is

25  ultimately ambiguous, as it is subject to more than one

1  plausible meaning.

2          Further, "short of a contract using magic words to

3  indicate that the employer has complete and unfettered

4  discretion over bonus allotment, a contractual right potentially

5  does exist, allowing the assertion of a breach of contract

6  claim. *Nevias*, 6.  Although Defendants suggest that such words

7  are not necessary, (see Defendant's Reply, ECF no. 28, at 3),

8  courts in this District routinely decline to dismiss breach of

9  contract claims where magic words are not included in the

10 agreement.  *See Nevias*, 6, which denied the motion to dismiss

11 even though the agreement used the word "discretion" throughout

12 because "defendant did not use such strong language as retaining

13 sole or absolute discretion." *Ashmore*, 9, noting that the bonus

14 provision didn't contain the magic words that courts generally

15 require before concluding that the employer's discretion was

16 unambiguous, and *Smith,* 2011 WL 2016293, at *4, which found a

17 plan that said distribution of bonus money was subject to

18 approval by executive management did not unambiguously confer

19 absolute discretion where the plan didn't include any magic

20 words.

21         And in the cases in which courts grant employers'

22 motions to dismiss, including those cited by Defendants for

23 support, the relevant provisions have those magic words.  *See*

24 *Lott v. Coreone*, 2016 WL 462486, at *12 (S.D.N.Y. Feb. 2nd,

25 2016), and *Kavitz v. IBM,* 2010 WL 11507447, at *7-8 (S.D.N.Y.

1  Aug. 27th, 2010.)  Here, the clause is devoid of any such magic

2  words unless it's plausible that a plaintiff had a right to

3  receive his bonus.

4          Because there's more than one reasonable

5  interpretation of a bonus provision, the contract is ambiguous

6  and the question of its proper interpretation cannot be decided

7  on a motion to dismiss.  *Tonra v. Kadmon,* 405 F. Supp. 3d 576,

8  584 (S.D.N.Y. 2019).  Accordingly, the motion to dismiss the

9  breach of contract claim based on failure to pay the bonus is

10  denied.

11         Defendants also argue that Plaintiff has failed to

12  allege the second element of a breach of contract claim, which

13  is adequate performance.  (*See* Defendant's Reply at page 4,

14  n.3.)  But because they waited in their Reply Brief to raise

15  this argument, and even only put it in a footnote, I'm not

16  obligated to consider it.  *See Knipe v. Skinner,* 999 F.2d 708,

17  711, and *Small Business Bodyguard v. House of Moxie*, 230 F.

18  Supp. 3d 290, 302 (S.D.N.Y. 2017).  In any event, I find

19  Plaintiff has sufficiently alleged performance at this stage.

20  Paragraph 47 says that Dr. Islam agreed that Plaintiff was

21  entitled to his full bonus.

22         Next, Plaintiff alleges that defendants breached the

23  agreement by assigning him to work on adult pathology cases

24  because, under the Agreement, Plaintiff was to provide services

25  only related to pediatric pathology.  (*See* ¶ 91 in Plaintiff's

Bench Ruling                    Fan v. WMC                    22

1   Opposition at 4-5).  Defendant's allege that the plain meaning

2   of the Agreement makes clear that Defendants could assign

3   Plaintiff additional duties beyond pediatric pathology as

4   needed.  That's in their Brief at 12-14.

5           The provision in the Agreement regarding the scope of

6   Plaintiff's work provides: "You shall serve in the roles

7   described in Schedule A attached hereto and made a part hereof

8   and shall devote your attention and best efforts to the practice

9   of your specialty, including those services described on

10  Schedule A and others customarily performed by a PC-employed

11  physician."

12          Schedule A, entitled "Attending Physician," says:

13          1, Responsibilities.  Your duties shall include, but

14  are not limited to, the following:

15          A, Clinical Services:  You shall provide pediatric

16  anatomical pathology services (neuropathology and medical renal

17  pathology excluded), including the performance of all

18  consultations, procedures, and other related services required

19  by patients in accordance with your delineation of privileges on

20  each Practice Site's medical staff as applicable.  Such duties

21  shall include your provision of weeknight and weekend on-call

22  services in general proportion to the number of physicians in

23  the section at a given time or otherwise as reasonably requested

24  by the Section Chief or the Director.  You shall also coordinate

25  your activities with the clinical referring services at each

1  Practice Site to ensure optimal patient care.  That's in the
2  agreement at pages 3 and 12.
3          Further, the provision regarding Plaintiff's
4  performance metrics states, "Pediatric Pathologist Performance
5  Metrics," and then there's a bunch of bullets:
6          Meet TAT goals for pediatric autopsy and surgical
7  sign-outs, initiate and develop strong working relationship with
8  pediatric surgical oncology colleagues, participate in pediatric
9  solid tumor working group, initiate and develop strong working
10 relationship with OB colleagues, initiate and develop pediatric
11 pathology teaching program for residents, involvement with
12 medical student teaching at NYMC, develop personal scholarship
13 program in conjunction with colleagues, residents, and students.
14 That's in the Agreement at 12.
15         Defendants first argue that the inclusion of the
16 language "include, but are not limited to, the following"
17 immediately after the heading "Responsibilities" unambiguously
18 reflects that the parties did not intend for the job duties
19 listed to be an exhaustive list and thus, Defendants could
20 assign duties outside pediatric pathology.  (Defendant's Brief
21 at 13.)
22         When interpreting a contract, contract terms and
23 provisions should be read in context and given a reasonable
24 meaning.  *See Cambridge Capital v. Ruby Has,* 675 F. Supp. 3d
25 363, at 390 (S.D.N.Y. 2023); *see Richard Feiner v. Paramount,*

1  941 N.Y.S.2d 157, 161 (1st Dep't 2012).  Similarly, rules of

2  contract construction, including the principal of *ejusdem*

3  *generis,* may guide courts in their interpretation of terms.

4  *See, e.g., Certain Underwriters at Lloyds v. Forty-Seventh Fifth*

5  *Company*, 2022 WL 3149001, at *2-3 (Sup. Ct. Apr. 22nd, 2022).

6  That rule provides that contract terms should be interpreted as

7  referring to concepts similar to the concepts with which the

8  terms are joined.  *Lloyds*, 2; *JN Contemporary Art V. Phillips*

9  *Auctioneers*, 507 F. Supp. 3d 490, 503 (S.D.N.Y. 2020), which

10  said "*ejusdem generis* is an interpretive guide according to

11  which the meaning of a word in a series of words is determined

12  by the company it keeps."

13          Applying these principles, I find the Agreement is at

14  least ambiguous as to whether Defendants had discretion to

15  assign Plaintiff to perform adult pathology services.

16  Defendants are correct that "to include the term 'to include'

17  may refer to some items within a larger set.  Often 'to include'

18  is to provide illustrative examples."  *Freedom Mortgage v.*

19  *Tschernia*, 2021 WL 1163807, at *3 (S.D.N.Y. Mar. 26th, 2021),

20  but the phrase "including, but not limited" to has been found to

21  be ambiguous.  *See Currier McCabe v. Public Consulting*, 2017 WL

22  4842023, at *9 (N.D.N.Y. Oct. 24th, 2017).

23          Additionally, "the terms 'including, but not limited

24  to,' prefacing a list...do not open the door wide to include

25  dissimilar [duties].  The phrase simply means that they're not

1   limited to those precise examples listed, but the list

2   illustrates the category to which [the duties] to be included

3   must be restricted." *Lloyd's*, *3.

4        The clause outlining the clinical services the

5   Plaintiff was to provide under the Agreement which followed the

6   phrase "including, but not limited to," describe the services as

7   pediatric.  Immediately thereafter, the Agreement sets out

8   Plaintiff's performance metrics which also use the word

9   "pediatric" throughout.  Additionally, after that provision, the

10  Agreement states that Plaintiff was to serve as the Medical

11  Director of Pediatric Pathology.  This is all on page 12 of the

12  Agreement.  Reading these provisions together, it would be a

13  plausible interpretation that the use of "pediatric" following

14  the phrase "including, but not limited to" modified the word

15  "duties" that precedes that phrase or the phrase "such duties"

16  in the sentence that follows the one containing the word

17  "pediatric."  In other words, it's plausible that the pediatric

18  services and metrics listed illustrate the category to which the

19  duties to be included must be restricted.  *Lloyd's*, *3.

20        Further, the Agreement states that Plaintiff "shall

21  devote his attention and best efforts to the practice of his

22  specialty, including those services described on Schedule A."

23  That's at page 3.  Reading this provision alongside Schedule A,

24  which, as discussed, says that Plaintiff was to provide

25  pediatric services, it's plausible that Plaintiff's specialty

Bench Ruling                        Fan v. WMC

1  refers to pediatric pathology rather than pathology in general.

2  Because Plaintiff's specialty is not defined in the Agreement

3  itself, the term is at least ambiguous and does not necessarily

4  support Defendant's position.  Similarly, reading the Agreement

5  as a whole, the provision stating that Plaintiff was to provide

6  services "customarily performed by a PC-employed physician,"

7  which appears on page 3, could plausibly have the meaning that

8  Plaintiff suggests, that Plaintiff was to provide services

9  customarily performed within pediatric pathology by a PC

10  physician.  *(See* Plaintiff's Brief at 21.)

11          Finally, although Defendants argue that the express

12  exclusion of certain services, specifically neuropathology and

13  medical renal pathology, necessarily means that those not

14  expressly excluded, like adult pathology services, were meant to

15  be included.  That argument appears in their Brief at page 14.

16  But this argument is unavailing at this stage.  Whereas one

17  would expect services like neuropathology and medical renal

18  pathology to be included if not excluded, one would not

19  necessarily expect adult pathology services to be included in

20  pediatric pathology services and thus, it is plausible the

21  parties would not have felt the need to expressly exclude them.

22          Therefore, I find it plausible at that stage that the

23  Agreement restricted Defendants from assigning Plaintiff's

24  duties beyond pediatric pathology such that Defendant's could

25  have breached the agreement by assigning adult pathology.

1  Because the reading is plausible, this portion of the Agreement

2  is ambiguous and I must deny the motion to dismiss.  *See*

3  *Maniolos v. U.S.,* 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010),

4  finding that summary dismissal is improper where contract

5  language is ambiguous.

6           Turning now to the labor law claims, Defendants argue

7  that I lack subject matter jurisdiction as to those claims

8  because Plaintiffs did not file a Notice of Claim, or "NOC."

9  That's in their Brief at 24-25.  Plaintiff argues that the NOC

10 requirements do not apply to his causes of action sounding in

11 retaliation.  That's in his Brief in 9-10.

12          New York General Municipal Law, or "GML," § 50-e,

13 provides that "in any case founded on tort where a Notice of

14 Claim is required by law as a condition precedent to the

15 commencement of an action...it shall comply with and be served

16 in accordance with the provisions of this section within 90 days

17 after the claim arises."  *Marshall v. Westchester Medical*

18 *Center,* 2024 WL 665200, at *11 (S.D.N.Y. Feb. 16th, 2024),

19 quoting GML.

20 § 50-e.

21          The *Marshall* case, at page 12, held that GML 50-e

22 applied only to actions sounding in tort.  It further held that

23 human rights claims, including those for retaliation under the

24 New York State Human Rights Law, or "HRL," are not tort actions

25 and thus do not require an NOC.  Again, *see Marshall*, 12.  I see

1  no reason why I should treat retaliation claims under the New

2  York Labor Law any differently.

3          Nevertheless, Defendants also argue that an NOC is

4  required by another statute, New York Public Authorities Law.

5  § 3316, which governs claims against public benefit

6  corporations.  This is in Defendant's Brief at 24-25.

7          Section 3316(1)(a) of the Public Authorities Law

8  states:

9          "Except in an action for wrongful death, no action or

10 special proceeding shall be prosecuted or maintained against the

11 corporation, its members, officers, or employees for personal

12 injury or damage to real or personal property alleged to have

13 been sustained by reason of the negligence, tort, or wrongful

14 act of the corporation or of any member, officer, agent, or

15 employee thereof unless Notice of Claim shall have been made and

16 served upon the corporation within the time limit set by and in

17 compliance with § 50-e of the General Municipal Law."

18         "It is clear from the plain reading of the statute

19 that GML § 50-e applies to public benefit corporations only for

20 actions alleging personal injury or damage to real or personal

21 property." *Marshall*, 11-12.  *Marshall* explained that because

22 human rights claims, such as those for retaliation, are not tort

23 claims under GML 50-e, they were not tort, personal injury, or

24 personal property claims under § 3316 either.  *Marshall*, 12.

25 Again, I see no reason why retaliation claims under the Labor

1  Law would be considered tort, personal injury, or personal

2  property claims where retaliation claims under the HRL are not,

3  especially due to the many parallels between the two statutes.

4          For instance, when analyzing whether an NOC was

5  required for claims brought under Civil Service Law § 75-b, the

6  First Department noted that the HRL § 75-b and Labor Law § 740

7  "are similarly concerned with the protection of public and

8  private employees" and that "retaliatory termination claims are

9  analogous to the HRL for purposes of compensation because 75-b,

10 Labor Law § 740, and the HRL all have the goal of remediating

11 adverse employment actions, which, if allowed, would undermine

12 an important public policy." *Castro v. City of New York*, 36

13 N.Y.S.3d 113, 116 (1st Dep't 2016.)  As a result of these

14 similarities, the First Department held that an NOC was not

15 required for claims under 75-b for the same reasons I find that

16 claims for retaliation under the New York Labor Law do not

17 require an NOC either.

18         The cases cited by Defendants do not alter that

19 conclusion.  In *Williams v. New York City Health & Hospitals*,

20 the Court noted that it appeared that no Notice of Claim was

21 required for whistleblower retaliation under Labor Law § 741.

22 *See* 88 N.Y.S.3d 847, 853 (Sup. Ct. Nov. 21st, 2018).  Although

23 the Court ultimately determined that it was bound by precedent

24 that did not rule that an NOC was not required, (*see Williams*,

25 854), it noted that the precedent it relied on pre-dated the

1  decision in *Castro* cited above.  The Court also noted that it

2  appeared from the relevant case law that whether a Notice of

3  Claim is required against a particular entity turns on whether

4  the language of the NOC provision limits the definition of tort

5  claims to those involving personal injury, wrongful death, or

6  property damages.  *Williams*, 854.  The NOC provision in § 3316

7  so limits the definition of tort claims.  *See Marshall*, 11-12.

8        Furthermore, in *Hutchinson v. Kings County Hospital*

9  *Center,* 32 N.Y.S.3d 210, 212 (2d Dep't 2016), on which

10 Defendants rely, the Court did not explicitly hold there was or

11 was not a Notice of Claim requirement for claims brought against

12 public benefit corporations under the Labor Law.  The plaintiff

13 there appears to have conceded the point, and thus, that case

14 does not preclude my decision that no NOC was required.  I,

15 thus, decline to dismiss for lack of subject matter

16 jurisdiction.

17        I now turn to whether Dr. Islam is an employer under

18 the Labor Law.

19        I'll first discuss §§ 740 and 215.

20        Section 740 prohibits retaliatory action by an

21 employer and defines employer as "any person, firm, partnership,

22 institution, corporation, or association that employes one or

23 more employees."  That somewhat unhelpful definition is found in

24 § 740(1)(b).

25        The statutory standard for employer status under the

1   Labor Law is nearly identical to that as the federal Fair Labor

2   Standards Act.  *Williams v. Epic Security,* 358 F. Supp. 3d 284,

3   305 (S.D.N.Y. 2019).  Courts in this Circuit consistently

4   interpret the two statutes co-extensively and thus apply the

5   economic reality analysis to the New York Labor law.  Under this

6   test, to determine who qualifies as an employer, the Court

7   considers "whether the individual (1) had the power to hire and

8   fire the employees, (2) supervised and controlled employee work

9   schedules or conditions of employment, (3) determined the rate

10  and method of payment, and (4) maintained employment records."

11  That's all *Williams,* 305.

12          Plaintiff alleges that Dr. Islam meets all four

13  factors.  Specifically, Plaintiff alleges in the AC that Dr.

14  Islam had supervisory authority over Plaintiff, (¶¶ 18 and 19),

15  and alleges on information and belief that Islam "had the power

16  to hire and fire employees, supervised and controlled employees'

17  schedules and conditions of employment, including Plaintiff,

18  determined the rate and method of payment for relevant employees

19  and/or employee salary bands or categories, including

20  Plaintiffs, and/or maintained or managed employee records,

21  including Plaintiff's."  That's ¶ 20.  Plaintiff then says,

22  "Defendants" -- excuse me, Plaintiff then states that,

23  "Defendants were an employer as defined by all relevant

24  statutes."  That's ¶ 21.  These allegations are the conclusory

25  "formulaic recitation of the elements of a cause of action"

1  condemned in *Twombly,* at U.S. 550 U.S. 555.  *See Aguilar v. New*

2  *DairyDel,* 2023 WL 5835829, at *3 (S.D.N.Y. Sept. 8th, 2023);

3  *Peng Bai v. Fu Xing Zhou,* 2014 WL 2645119, at *4 (E.D.N.Y. Jun.

4  13th, 2014); and *Tracy v. NVR*, 667 F. Supp. 2d 244, 247 (W.D.

5  2009), all finding that similar boilerplate recitations to be

6  conclusory and lacking supporting details insufficient to meet

7  the economic reality test.

8          Plaintiff also groups all Defendants together

9  throughout the Amended Complaint.  For example, he states that

10 his employment contract was "drafted by Defendant," (¶ 27), and

11 that Defendants, without specifying which ones, assigned

12 Plaintiff an increased call volume.  (¶ 35.)  These allegations

13 do not support the conclusion that Dr. Islam had any specific

14 authority or was Plaintiff's employer.  *See Aguilar*, 4.

15         But Plaintiff does allege some actions taken

16 specifically by Dr. Islam which could support a finding that

17 Islam was Plaintiff's employer.  For example, Plaintiff claims

18 that Islam placed him on 24/7 call, (¶ 35), "insisted Plaintiff

19 take on the duties of adult pathologist while also performing

20 pediatric pathology and supervising a junior pediatric

21 pathologist," (¶ 33), and assigned him to "frozen duties."

22 (¶ 55.)  Plaintiff also alleges that Islam had authority over

23 his bonus, (¶ 47), and also had authority over his requests for

24 leave.  (¶ 56.)

25         These facts indicate that Islam supervised and

1  controlled the work schedules or conditions of employment and

2  thus, Plaintiff sufficiently alleges that Islam meets factor 2.

3  *See Weng v. Hungry Panda*, 2022 WL 292799, at *6 (S.D.N.Y. Jan.

4  31st, 2022).  And while the AC does not allege facts showing

5  that Dr. Islam set the rate and method of regular pay,

6  Plaintiff's allegations regarding Dr. Islam's role in deciding

7  the amount and timing as to the payout of Plaintiff's bonus

8  suggests some control over payment, so this factor is met,

9  albeit weakly.

10        The AC does not include any allegations regarding

11  factors 1 and 4 aside from the conclusory allegations noted

12  above.  Nevertheless, "courts have repeatedly found that

13  complaints with factual allegations that satisfy only some of

14  the factors are sufficient to survive a motion to dismiss."  *De*

15  *Quan Lu v. Red Koi*, 2020 WL 7711410, at *6 (S.D.N.Y. Dec. 29th,

16  2020), which found the complaint adequately pleaded that the

17  defendant was plaintiff's employer even though the factual

18  allegations supported only one or, at best, two of the factors

19  in the economic reality test and collecting cases.  See

20  *Campagnone v. MJ Licensing,* 2019 WL 195931, at *3 (S.D.N.Y. May

21  2nd, 2019), where only factors 2 and 3 were met.

22        Accordingly, drawing all reasonable inferences in

23  Plaintiff's favor, as I must at this stage, I find Plaintiff has

24  adequately pleaded that Dr. Islam was Plaintiff's employer.

25        As for § 215, the parties seem to assume that one must

1   be an employer to be liable for retaliation, but "the text of

2   the New York Labor Law's prohibition on retaliation is broad and

3   applies to both an employer and to any other person." *Demirovic*

4   *v. Ortega*, 2017 WL 5196240, at *3 (E.D.N.Y. Nov. 9th, 2017),

5   quoting Labor Law 215(2)(a).  Thus, a person need not be an

6   employer to be held liable for retaliation under the Labor Law.

7   *Demirovic*, 3.  Because Dr. Islam is clearly a person, he may be

8   liable under § 215 as well.

9           Turning to § 741, Plaintiff does not separately

10  respond Dr. Islam's argument that he does not qualify as an

11  employer under 741 and thus, Plaintiff has abandoned the claim.

12  *See Malik v. City of New York,* 841 F. App'x 281, 284, and *Thomas*

13  *v. New York City Department of Education,* 938 F. Supp. 2d 334,

14  354 (E.D.N.Y. 2013).  In any event, Dr. Islam is correct, the

15  definition of "employer" in 741 differs from 740.  741(1)(b)

16  defines "employer" as a partnership, association, corporation,

17  state, or any political subdivision of the state.  Because the

18  plain language specifically excludes individuals, including an

19  employer's agent, individuals are not employers under § 741.

20  *See Geldzahler v. New York Medical School,* 746 F. Supp. 2d 618,

21  631 (S.D.N.Y. 2010); *Zhou v. Roswell Park*, 2022 WL 4287662, at

22  *5 (W.D. Jul. 25th, 2022), *report and recommendation adopted,*

23  2022 WL 3334268, August 12th 2022, and *Ruiz v. Lenox Hill,* 45

24  N.Y.S.3d 427, 430 (1st Dep't 2017).

25          So the claim against Dr. Islam under 741 is dismissed.

1           Let's take five minutes.

2           (Recess taken)

3           THE COURT:  All right, now let's talk about the merits

4   of the Labor Law claims.  I'll start with the 215 claim.

5           Plaintiff argues Defendants retaliated against him for

6   his complaints about the withholding of his bonus and the

7   unsanitary conditions in the autopsy suite.  (¶¶ 85-89.)

8   Defendants argue in their Brief at 16 that both of these

9   theories are invalid.

10          Section 215(1)(a) provides, in relevant part, "no

11  employer or his or her agent...shall discharge, threaten,

12  penalize, or in any other manner discriminate or retaliate

13  against any employee because such employee has made a complaint

14  to his or her employer...that the employer has engaged in

15  conduct that the employee reasonably and in good faith believes

16  violates any provision of this chapter."  To establish a claim

17  under 2015, a plaintiff must allege (1) "participation in

18  protected activity known to the defendant, (2) an employment

19  action disadvantaging the plaintiff, and (3) a causal connection

20  between the protected activity and the adverse employment

21  action."  *McSweeney v. Cohen*, 2015 WL 966022, at *42 (S.D.N.Y.

22  Mar. 31st, 2025).

23          As for the first element "an employee engages in

24  protected activity when he complains of an employment practice

25  that he reasonably believes violates the law."  *Daniels v.*

1  *American Airlines*, 2022 WL 493573, at *6 (Feb. 17th, 2022).  For

2  the second element, the standard for an employment action

3  disadvantaging the plaintiff is the same as that under Title

4  VII: an employment action disadvantages an employee if it well

5  might have dissuaded a reasonable worker from making or

6  supporting similar charges.  *Robinson v. De Niro,* 779 F. Supp.

7  3d 33, 88 (S.D.N.Y. 2023).  Finally, the causal connection can

8  be established by "(1) evidence of retaliatory animus directed

9  against a plaintiff by the defendant or (2) a close temporal

10  proximity between the protected activity and the adverse

11  employment action."  *Robinson*, 88.

12          I'll start with the withholding of the bonus.

13          Plaintiff argues that he complained about the

14  withholding of the bonus, which he reasonably believed to be a

15  violation of New York Labor Law § 193, and which therefore

16  constitutes protected activity.  That's in his Brief at 15-16.

17  Defendants in their Brief at 16-17 argue, there was no violation

18  of the Labor Law because a bonus does not constitute wages for

19  purposes of 193, nor was it reasonable for Plaintiff to belief

20  that his bonus constituted wages because his bonus was

21  discretionary.

22          Looking first at whether the bonus constitutes wages,

23  "§ 193, which governs deductions from employee wages, states

24  that no employer shall make any deduction from the wages of an

25  employee, except in specific circumstances, which largely

1  benefit the employee, including deductions for retirement

2  benefits or health care." *Tonra,* 40 F. Supp. 3d at 585.  "Under

3  New York law, it is well settled that the definition of wages as

4  covered by NYLL § 193 does not include incentive-based

5  compensation plans where an employee receives a guaranteed

6  salary and may also receive supplemental income based on the

7  dual performance of the employee and the business or as a result

8  of other factors outside of the employee's control."

9  "Therefore, discretionary bonuses are not wages under NYLL § 193

10 because they are dependent, at least in part, on factors outside

11 the employee's control."  But non-discretionary bonuses can be

12 considered wages.  That's all in *Tonra*, 585.

13         Courts do not only consider whether a bonus was

14 discretionary, however, to determine whether a bonus constitutes

15 wages under § 193.  In *Hallett v. Stewart Dean*, the court

16 explained that New York courts apply three factors to determine

17 whether incentive compensation qualifies as wages under § 193:

18 whether the incentive compensation was (1) tied to personal

19 productivity or company performance, (2) guaranteed or

20 discretionary, and (3) vested or contingent.  481 F. Supp. 3d

21 294, 310 (S.D.N.Y. 2020.)

22         Here, Plaintiff has plausibly alleged that his bonus

23 was tied to his personal productivity, as the provision states

24 that he would be eligible for a bonus based on his success in

25 meeting the performance metrics and in achieving a specific set

1  of targets and he would be eligible for a productivity bonus if

2  he exceeded 5,900 RVUs.  That's in the Agreement at 14-15.

3  Additionally, because I found the bonus provision was ambiguous

4  as to whether his bonus was discretionary, the second factor is

5  also met at this stage.  *See Kolchins v. Evolution Markets,* 31

6  N.Y.3d 100, 110 (N.Y. Ct. App. 2018), which found a bonus could

7  constitute wages because the language of the agreement did not

8  conclusively establish that the bonus was discretionary.  And

9  finally, Plaintiff has plausibly alleged that his bonus had

10 vested because the Agreement said he was eligible for a bonus

11 per employment year and Plaintiff alleged he was employed for

12 more than a year when he first complained about not receiving

13 the bonus.  He also alleges Islam agrees that he was entitled to

14 the bonus.  (¶ 47.)  *See Hallett*, 310, noting that the Plaintiff

15 plausibly alleged that the bonus was tied to the calendar year

16 such that it vested before his termination.

17         Therefore, Plaintiff has plausibly alleged the three

18 factors and as such, has plausibly alleged that it was at least

19 reasonable for him to believe that his bonus constituted wages

20 under § 193.  *See Hallett*, 310, and *Ryan v. Kellog Partners*, 19

21 N.Y.3d 1, 16 (Ct. App. 2012.)

22         Accordingly, by complaining about the withholding of

23 his bonus, Plaintiff has plausibly alleged that he engaged in

24 protected activity under 215.

25         But he must also plausibly allege an adverse

1  employment action and causation, and Defendants argue that

2  Plaintiff failed as to both.  (*See* Defendant's Brief at 20, n.8,

3  and 20, n.9.)

4        Plaintiff does not specify how Defendants retaliated

5  against him specifically for complaining about the bonus, but he

6  does generally allege a number of adverse employment actions,

7  including: (i) failing to pay the bonus, (ii) increasing his

8  call volume, (iii) placing him on 24/7 call, (iv) assigning him

9  duties beyond the scope of his contract, (v) assigning him to

10 work in the autopsy suite knowing this would affect his

11 compensation, (vi) denying or delaying his requested time off,

12 and (vii) firing him.  (*See* Plaintiff's Opposition at 12 and the

13 AC at 56-63.)

14       Not all of these actions, even if they constitute

15 adverse employment actions, could possibly be causally linked to

16 Plaintiff's complaints about his bonus.  Obviously, failing to

17 pay the bonus cannot be retaliation for complaining about

18 failing to pay the bonus because the allegedly retaliatory

19 conduct preceded the protected activity.  *See Robinson*, 89,

20 noting that adverse employment action preceding protected

21 activity cannot be adverse action taken because of protected

22 activity.

23       Similarly, it's not plausible that Defendants assigned

24 Plaintiff to adult cases in retaliation for Plaintiff's

25 complaints regarding his bonus because Plaintiff alleges that

1  the assignments to adult cases preceded this protected activity.

2  (Compare the AC at 8 and specifically the heading "Plaintiff

3  Commenced Employment With Defendants...followed by the

4  allegation that Defendants "quickly began assigning Plaintiff

5  adult cases," with ¶ 47 noting Plaintiff first complained about

6  his bonus on November 17th, 2020, after he had been employed for

7  more than a year.)  *See De Niro*, 88, noting that actions that

8  took place before the activity cannot form the basis of a

9  retaliation claim.

10        As for the other actions, denying or delaying

11  Plaintiff's vacation request could be considered an adverse

12  employment action.  Generally, "the denial of a single vacation

13  request without any indication that there was an absolute

14  prohibition against plaintiff taking any vacation time is not a

15  material adverse employment action."  *Drouillard v. Sprint,* 375

16  F. Supp. 3d 245, 272 (E.D.N.Y. 2019).  Plaintiff does not allege

17  that there was an absolute prohibition against him taking

18  vacation time and even mentions that he did take a vacation.

19  (¶ 51.)

20        On the other hand, Plaintiff does not just allege a

21  single denial.  Instead, Plaintiff alleges that in addition to

22  sitting on Plaintiff's requests to visit his elderly parents in

23  China, Dr. Islam also routinely denied requests for days off.

24  He further alleges that Islam directed Plaintiff that he had to

25  submit requests a month in advance while others were afforded

1  rightful sick and vacation days regularly and without such

2  retaliatory roadblocks.  That's ¶ 56.  And although denials of

3  vacation requests are generally not considered adverse

4  employment actions under the standard for discrimination claims,

5  which requires an action to be materially adverse, the standard

6  is lower for retaliation claims.  *See Shipkevich v. New York*

7  *Presbyterian*, 2020 WL 6561802, at *21, n.27 (S.D.N.Y. Jul. 22nd,

8  2020), *report and recommendation adopted* 2020 WL 5796202 (Sept.

9  29th, 2020).  Taking all these allegations together, the denial

10 of Plaintiff's request conceivably could rise to the level of an

11 adverse employment action.  *See Shipkevich*, n.27, noting that

12 delays in approving vacation requests might meet the standard

13 for adverse employment actions in retaliation claims.

14         But assuming they did, the AC does not adequately

15 allege a causal connection between the time-off delays and

16 denials and his protected activity.  Plaintiff alleges he

17 complained to Defendants about his bonus in November 2022,

18 December 2022, and June 2023, (¶¶ 47 and 59), but Plaintiff

19 fails to allege any dates as to when the denials of his vacation

20 requests occurred.  As such, "it is impossible for the Court to

21 determine the temporal proximity of the alleged retaliatory acts

22 to the protected conduct."  *Feliciano v. City of New York*, 2015

23 WL 4393163, at *9 (S.D.N.Y. Jul. 15, 2015); *see Gaughan v.*

24 *Rubenstein*, 261 F. Supp. 3d 390, 418-19 (S.D.N.Y. 2017), also

25 noting no inference of causation can be drawn without dates as

1 to when the protected activity occurred.  Here, there's no date

2 about when the alleged adverse action occurred as in *Feliciano*.

3          Further, the AC does not plausibly allege direct

4 evidence of retaliatory animus, because although Plaintiff

5 alleged that other employees did not have their travel plans or

6 sick days thwarted, he fails to allege that those employees

7 "were similarly situated to Plaintiff in material respects such

8 that Defendant's decision could be attributed to Plaintiff's

9 complaints." *Figueroa-Torres v. Kleiner,* 2022 WL 768483, at *15

10 (S.D.N.Y. Mar. 14th, 2022), noting that Plaintiff failed to

11 allege a causal connection between the adverse action and

12 Plaintiff's filing of a lawsuit where Plaintiffs only alleged

13 that some employees received discretionary payments while

14 Plaintiff did not.  And the AC does not allege that any

15 Defendant ever made any statements about Plaintiff's complaints

16 regarding his bonus, let alone any statements condemning them.

17 *See Azeez v. Ramaiah,* 2015 WL 1637871, at *9 (S.D.N.Y. Apr. 9th,

18 2015), finding no direct evidence of retaliatory animus in the

19 absence of statements referring to or condemning the protected

20 activity.

21          Nevertheless, Plaintiff adequately alleges that

22 assigning him to the autopsy suite was retaliatory.  First, that

23 assignment is plausibly an adverse employment action because the

24 reassignment to less favorable duties, even when those duties

25 fall within an employee's job description, may constitute an

1  adverse retaliatory action.  *Burlington Northern v. White,* 548

2  U.S. 53 at 70-71, especially where the reassignment impacts a

3  plaintiff's compensation.  *Cf. Banks v. General Motors,* 81 F.4th

4  242, 278, which found that even a reassignment not involving

5  financial repercussions can constitute an adverse action.

6          Additionally, Plaintiff has adequately alleged a

7  causal connection because, although direct evidence of

8  retaliatory animus is still lacking, here, there is temporal

9  proximity.  As mentioned, Plaintiff alleges that he complained

10 about his bonus several times in June 2023, (¶¶ 47 and 59), and

11 that he was put on autopsy service "in or around" that month.

12 (¶ 51.)  Plaintiff, frustratingly, does not give a coherent

13 timeline showing a complaint in that month preceded the

14 assignment to the autopsy service, but giving Plaintiff the

15 benefit of every inference, these facts barely suffice to render

16 it plausible that at least one complaint preceded the assignment

17 and if so, the temporal proximity is close enough to raise an

18 inference of causation.

19         Similarly, although the causal inference that

20 Plaintiff's termination was in retaliation for Plaintiff's

21 complaints about his bonus is weak, because Plaintiff alleged in

22 the AC that his termination was in "immediate retaliation" for

23 complaining to Chief of Service Gewitz about the "fundamental

24 disagreement" between Plaintiff and Dr. Islam, which appears to

25 be whether Defendants could assign Plaintiff to adult cases, (¶¶

1  62-63), Plaintiff has sufficiently pleaded such a connection at

2  this stage.  First, by stating that his termination was in

3  immediate retaliation, Plaintiff may not have intended to say

4  his termination could not also have been in response to any

5  other protected activity and, second, there is a temporal

6  connection between the termination and his complaints, given

7  that he complained about the bonus in June 2023 and was

8  terminated in July.  (*See* ¶¶ 47, 59, 62, and 63.)  *See Krebaum*

9  *v. Capital One,* 29 N.Y.S.3rd 351, 353 (App. Div. 1st Dep't

10 2016), finding one month to indirectly show the requisite causal

11 connection.

12         Accordingly, the claim under 215 for retaliation based

13 on the withholding -- based on the complaint regarding the

14 withholding of the bonus and the adverse action of the

15 reassignment to the lab survives.  Barely.

16         Plaintiff also argues Defendants retaliated against

17 him when he complained about the unsanitary conditions in the

18 autopsy suite, which he reasonably believed to be a violation of

19 Labor Law § 200.  That's in his Brief at 15-17.  Defendants

20 argue the allegations in the Complaint about the supposed safety

21 issues were too speculative to sustain a 215 claim and that

22 Plaintiff failed to establish a causal connection between the

23 complaints about the lab and the adverse actions.  Not the lab,

24 the suite.

25         Defendant also seems to argue that a violation of §

1  200 cannot serve as a predicate for a 215 claim.  That's in

2  Defendant's Reply at page 6, n.5.  Again, I don't even have to

3  consider it, but I disagree.  Section 215 provides that a

4  plaintiff engages in protected activity if he complains about

5  conduct that he "reasonably and in good faith believes violates

6  any provision of this chapter."  By the plain language of the

7  statute, conduct that Plaintiff reasonably believes to be a

8  violation of § 200, a provision of the Labor Law, could form the

9  basis of a 215 claim.  Further, the very case Defendants urge me

10  to follow, *Mayer v. Neurological Surgery*, 2015 WL 13738361, at

11  *3-4 (E.D.N.Y. Dec. 21, 2015) seems to assume that a violation

12  of § 200 could be a predicate for a 215 claim.

13          I find Plaintiff has adequately alleged that he

14  reasonably believed that the alleged unsanitary conditions in

15  the autopsy suite violated § 200, which provides that "all

16  places to which this chapter applies shall be so constructed,

17  equipped, arranged, operated, and conducted as to provide

18  reasonable and adequate protection to the lives, health, and

19  safety of all persons employed therein or lawfully frequenting

20  such place."  The AC included allegations that the pathology lab

21  "was not properly cleaned" and had "human body

22  parts/specimens...haphazardly strewn about on the floor and

23  other surfaces."  (AC ¶ 2.)  It also said that the suite was

24  "disorganized and posed a danger to those working in the suite"

25  and posed an "especially high risk to residents at WMC such as

1 those who were pregnant and their fetuses."  (¶ 36.)

2        Defendants argue this case is analogous to *Mayer*, at

3 page 4, because any safety issues posed by these alleged

4 unsanitary conditions are "hypothetical and highly speculative."

5 (Defendant's Brief at 18.)  But the employer conduct at issue in

6 *Mayer,* discouraging an employee from using her health insurance

7 or following the advice of her doctor, did not suffice because

8 it did not relate to safety of the workplace.  It was materially

9 different from the alleged conduct and possible safety risks to

10 employees and patients alleged here, which relate directly to

11 the maintenance of the workplace.  It is plausible that the

12 unsanitary working conditions Plaintiff described, including

13 leaving human body parts and specimens strewn about and the

14 falsification of logs purportedly showing decontamination of the

15 lab, (¶¶ 2, 3, 9, and 36), could cause pathogens to spread, as

16 Plaintiff suggests in his Opposition at 14, endangering the

17 health and safety of employees who frequent the suite and those

18 with whom they come into contact at the hospital.  These risks

19 are not highly speculative.

20        Nevertheless, Plaintiff has failed to establish a

21 causal connection between this activity and any adverse

22 employment action.  Apart from a conclusory allegation in ¶ 9

23 that when he complained, the Defendants retaliated, the AC is

24 silent as to when Plaintiff complained about the alleged

25 unsanitary conditions and as to what adverse action allegedly

1  resulted and when. (*See* ¶ 36). As already discussed in the

2  absence of any indication about when the protected activity

3  occurred, "it is impossible for the Court to determine the

4  temporal proximity of the alleged retaliatory acts to the

5  protected conduct. *Feliciano*, 9; *see Gaughan*, 418-19. And

6  Plaintiff does not plausibly allege direct evidence of

7  retaliatory animus because there are no allegations, for

8  example, that Defendants ever made any comments condemning

9  Plaintiff for his complaints regarding the conditions of the

10 suite.

11         Accordingly, the 215 claim based on his complaints

12 about the unsanitary conditions of the autopsy suite must be

13 dismissed.

14         To the extent Plaintiff argues his assignment to adult

15 pathology cases also constituted a violation of § 200, (*see*

16 Plaintiff's Opposition at 16 and 17), and thus, that his

17 complaints about that assignment could form the basis of his 215

18 claim, Plaintiff is incorrect. Section 200 is meant to protect

19 employees, not patients, from dangerous workplace conditions.

20 *See Mayer*, 4. Thus, even construing Plaintiff's allegations in

21 the light most favorable to him, it was not reasonable for him

22 to believe that Defendant's conduct violated § 200. Any 215

23 claim on that basis must also be dismissed.

24         Turning now to the merits of the 740 claim, that

25 section prohibits employers from taking retaliatory action

1  against an employee who "discloses or threatens to disclose to a

2  supervisor or to a public body an activity, policy, or practice

3  of the employer that the employee reasonably believes is in

4  violation of the law, rule, or regulation or that the employee

5  reasonably believes poses a substantial and specific danger to

6  the public health or safety."  That's Labor Law § 740(2)(a).

7          To state a claim under that section, a Plaintiff has

8  to plead the same three elements as 215: protected activity,

9  adverse employment action, and causal connection.  *Callahan v.*

10 *HSBC*, 723 F. Supp. 3d 315, 326 (S.D.N.Y. 2024).

11         Plaintiff claims he was engaged in protected activity

12 under § 740 by complaining that Defendants were unlawfully

13 withholding his bonus and forcing unsafe work, in violation of

14 law, rules, and regulations, including his assignment to adult

15 cases and the conditions of the autopsy suite.  That's in

16 Plaintiff's Opposition at 10-11.  Defendants argue that

17 Plaintiff failed to plausibly allege an activity, policy, or

18 practice that he reasonably believed violated the law and that

19 it was not reasonable for him to believe either that the

20 unsanitary conditions or his assignment to adult pathology cases

21 was unlawful or posed a substantial and specific danger to

22 public health or safety.  That's at Defendant's Brief at 19-20.

23 They also argue Plaintiff failed to plead an adverse employment

24 action or causal connection.  That's at 20-22.

25         As an initial matter, Defendants do not address in

1  either of their briefs the § 740 claim that Defendants

2  retaliated against him for his complaints about the alleged wage

3  violation of withholding his bonus.  *See* the AC at 17 and ¶ 72,

4  which under the heading "First Cause of Action For Retaliation

5  Under § 740, including the allegation that on occasions too

6  numerous to specify, including a connection with the...breach of

7  contract and wage violations, Plaintiff reported this unlawful

8  conduct in good faith to Defendants."  And also see Plaintiff's

9  Opposition at 10, noting in his 740 argument that he complained

10 about the unlawful withholding of his bonus.  As such, that part

11 of the claim survives.

12        As for Plaintiff's claim based on his complaints about

13 the unsanitary conditions in the autopsy suite, these may

14 constitute protected activity as explained earlier.

15        As noted, it's plausible that unsanitary working

16 conditions would present a danger not only to employees' health

17 and safety, but also to the patients that they come into contact

18 with as pathogens spread.  Danger to the health and safety of a

19 hospital's patients qualifies as a danger to public health and

20 safety.  *See Minogue v. Good Samaritan,* 952 N.Y.S.2d 52, 57.

21 (2d Dep't 2012), and thus, Plaintiff has adequately alleged a

22 reasonable belief of such danger under § 740.  The cases

23 Defendant says are inapposite as they concern a completely

24 different type of employer conduct and harm.  *See Ramirez v.*

25 *Tifaret*, 2023 U.S. Dist. LEXIS 174184, at *27 (S.D.N.Y. Sept.

1  18th, 2023), involving a single instance of an assault on the

2  plaintiff by a co-worker; *Lee v. Delta*, 2024 U.S. Dist. LEXIS

3  134748, 70-71 (S.D.N.Y. Jul. 29th, 2024), which involved an

4  allegation that the defendant was self-insured rather than

5  having third-party insurance; *see also Finch v. New York State,*

6  12 U.S. Dist. LEXIS 99453, 36 (S.D.N.Y. May 30th, 2012), finding

7  that complaints about wasteful spending and double ordering

8  leading to an accumulation of drugs in supply closets did not

9  relate to a substantial and specific danger to public health

10 under § 741.

11          So the complaints about the unsanitary conditions are

12 protected activity, but Plaintiff fails to establish the causal

13 connection between this activity and any adverse employment

14 action and thus fails to state a claim on this basis under 740

15 for the same reasons he failed to state a claim under 215.

16          He does, however, state a claim based on the

17 assignment of adult cases.  The AC memorializes the complaints

18 Plaintiff made on multiple occasions throughout his employment,

19 about his assignment to adult cases, and the consequences he

20 believed would result.  *(See, for example*, ¶¶ 35, 42,48, 57-59.)

21 Thus, he sufficiently "identifies the particular activity...in

22 which the employer allegedly engaged so that the complaint

23 provides the employer with notice of the alleged complaint of

24 conduct" as required.  *Webb-Weber v. Community Action*, 23 N.Y.3d

25 448, 453 (Ct. App. 2014).

 1          He's also adequately alleged that he reasonably

 2    believed that assigning him to work on adult cases posed a

 3    substantial and specific danger to public health and safety.  He

 4    repeatedly alleges he was not comfortable covering such work,

 5    that it was unfair to adult patients, that he was not ready for

 6    it, and it was beyond his comfort zone.  (¶¶ 48, 58, and 59).

 7    He also offered to take courses or receive training on certain

 8    adult pathology services, the need for which highlights his lack

 9    of competence in adult pathology and his belief that taking on

10    such work would harm others.  (*See* ¶ 55).  It was also

11    reasonable for the Plaintiff to believe that forcing a doctor to

12    perform work with which he was not experienced and uncomfortable

13    could pose a substantial harm to patients.  This was true,

14    although Plaintiff apparently had a limited ability to perform

15    certain adult pathology services.

16          As an example of the potential harm that could result,

17    Plaintiff notes in his Complaint, ¶ 42, n.2, that he discovered

18    and remedied multiple cases where another pathologist attempted

19    to work outside his field of expertise and mistakenly labeled

20    benign cases as malignant.  It's also possible, as Plaintiff

21    alleges, that requiring Plaintiff to take on the duties he was

22    not comfortable with would compromise his pediatric pathology

23    service, thus posing harm to his other patients.  (¶ 48).  In

24    short, the examples provided by Plaintiff, and common sense,

25    establish that it was reasonable for Plaintiff to believe that

1  Defendant's actions of assigning him to work for which he was

2  not competent posed a threat to public health and safety.

3          Finally, Plaintiff has adequately alleged a causal

4  connection between his protected activity of complaining about

5  the assignment to adult cases and at least one adverse

6  employment action.  Although not all of the actions alleged by

7  Plaintiff constitute adverse actions on their own, termination,

8  of course, does.  (*See* Labor Law § 740(1)(e).)  Plaintiff

9  alleges that on the same day he complained to Dr. Gewitz about

10 the fundamental disagreement between himself and Dr. Islam, he

11 was terminated in immediate retaliation.  (*See* ¶¶ 62-63.)  As

12 already noted, taking the Complaint as a whole, it seems the

13 fundamental disagreement was the assignment of adult cases, thus

14 the temporal proximity plausibly establishes a causal connection

15 at this stage.  Even if that was not the fundamental

16 disagreement to which Plaintiff was referring in his e-mail to

17 Dr. Gewitz, Plaintiff still plausibly pleads temporal proximity

18 because he alleges he complained that he was being pressured to

19 carry out duties beyond his comfort zone on June 30th, 2023,

20 just a month before he was fired.

21         Additionally, even if some actions are insufficient on

22 their own to amount to an adverse employment action in Title VII

23 cases, "alleged acts of retaliation need to be considered both

24 separately and in the aggregate as even minor acts of

25 retaliation can be sufficiently substantial in gross as to be

1  actionable." *Anderson v. New York City,* 2020 WL 1528101, at *9

2  (S.D.N.Y. Mar. 21st, 2020).  The same is true for retaliation

3  claims brought under Labor Law § 740.  *See Rackley v.*

4  *Constellis*, 2024 WL 3498718, at *29 (S.D.N.Y. Jun. 17th, 2024).

5          Thus, putting Plaintiff on 24/7 call and increasing

6  his call volume, when combined with the other adverse actions

7  alleged, or at least those that are temporarily possible to have

8  been retaliatory, may be actionable.  *See Murray v. UPS,* 2022 WL

9  4468295, at *19-20 (E.D.N.Y. Sept. 25th, 2022).  While Plaintiff

10  does not say the specific dates that these allegedly adverse

11  employment actions occurred, he does state that Defendants

12  placed him on 24/7 call and it increased his call volume in

13  immediate retaliation" for raising concerns about assigning him

14  adult cases, (¶ 35), and these actions appear to have occurred

15  shortly after Plaintiff began his employment, which is also when

16  he alleged was pushed to take on adult cases, (*see* AC at 8),

17  providing further support of inference of temporal proximity.

18          Assigning Plaintiff adult pathology duties, however,

19  cannot be considered retaliatory because it began before the

20  protected activity and, indeed, is what Plaintiff was

21  complaining about.  *See De Niro*, 89.  Or, actually, it's

22  *Robinson*, 89.

23          Similarly, Plaintiff has plausibly alleged that the

24  withholding of his bonus was retaliatory.  First, withholding a

25  bonus qualifies as an adverse act under § 740.  *See Callahan,*

1  723 F. Supp. 3d at 327.  Second, Plaintiff alleges temporal

2  proximity between protected activity and the withholding of the

3  bonus.  He alleges he complained to Dr. Islam about his

4  assignment to adult cases in late August 2022, although he cites

5  to this as just one example and alleges that he complained

6  throughout his employment.  (¶ 45).  He also alleged he was

7  entitled to his employment after one year of employment which

8  would have been October 2022, since he started in October of

9  2021, (¶ 47), and an approximately two-month gap is sufficient

10 to establish a causal connection at this stage.  *See Amaya v. La*

11 *Grande Boucherie,* 24 WL 2136044, at *7 (S.D.N.Y. May 13th,

12 2024).  Thus, as Plaintiff has adequately pleaded a causal

13 connection between his complaints about his assignment to adult

14 cases and the withholding of his bonus, the 740 retaliation

15 claim survives.

16         As to 741, it prohibits employers from taking

17 retaliatory action against an employee who "discloses or

18 threatens to disclose to a supervisor...an activity, policy, or

19 practice of the employer or agent that the employee in good

20 faith reasonably believes constitutes improper quality of

21 patient care or improper quality of workplace safety."  That's

22 741(2)(a).  Defendants argue that Plaintiff fails to establish

23 that assigning him to adult cases constitutes improper patient

24 care and that Plaintiff fails to articulate how the unsanitary

25 conditions in the autopsy suite posed a danger to the public or

1  a specific patient.  That's in their Brief at 22-23.  But

2  Plaintiff does not have to conclusively establish that either

3  the work assignment or the unsanitary conditions actually

4  constituted improper patient care, only that he reasonably

5  believed it did.  *See Underwood v. Roswell Park*, 2017 WL 131740,

6  at *19 (W.D.  Jan. 13th of 2017).

7          Improper quality of care is defined as a practice that

8  poses "a substantial and specific danger to public health or

9  safety or a significant threat to the health of a specific

10 patient."  *Underwood*, 19.  Therefore, the analysis under 741 as

11 to whether Plaintiff complained about a practice of Defendants

12 that he reasonably believed to constitute improper quality of

13 care and thus, whether he engaged in protected activity is the

14 same as it was under 740.  Because I've already found Plaintiff

15 has adequately alleged that he reasonably believed that

16 assigning him to work on adult cases posed a substantial and

17 specific danger to public health and safety, I find he plausibly

18 alleged he engaged in protected activity under 741.

19          Additionally, for the same reasons already discussed,

20 I find he's adequately alleged a causal connection to numerous

21 adverse employment actions and therefore his claim for

22 retaliation under 741 based on his assignment to adult pathology

23 cases survives.

24          Finally, although Plaintiff has adequately pleaded a

25 reasonable belief that the allegedly unsanitary conditions in

1   the autopsy suite constituted improper patient care, the 741

2   claim based on these complaints must be dismissed for the same

3   reasons already discussed, failure to establish a causal

4   connection between such complaints and any adverse action.

5          Finally, as to leave to amend, it should be freely

6   given when justice so requires under Rule 15, but it remains

7   within the sound discretion of the court.  *Kim v. Kimm,* 884 F.3d

8   98, 105.  Leave to amend, though liberally granted, may properly

9   be denied for repeated failure to cure deficiencies by

10  amendments previously allowed or futility, among other reasons.

11  *Ruotolo v. City of New York*, 514 F.3d 184, 191.

12         Plaintiff already amended after having the benefit of

13  a pre-motion letter from Defendants outlining their proposed

14  grounds for dismissal and the discussion at the July 2nd, 2024,

15  pre-motion conference.  In general, a plaintiff's failure to fix

16  deficiencies in the previous pleading, after being provided

17  notice of them, is alone sufficient grounds to deny leave to

18  amend.  *See National Credit Union v. U.S. Bank*, 898 F.3d 243,

19  257-58.  *See also Baines v. Nature's Bounty,* 2023 WL 8538172,

20  at *3 (2d Cir. Dec. 11th, 2023), and *Bardwell v. Kennedy,* 2020

21  WL 2748248, at *4 (S.D.N.Y. May 27th, 2020.)

22         Defendant's pre-motion letter, however, did not raise

23  the issue of Plaintiff's failure to plead a causal connection

24  between his complaints with respect to the alleged unsanitary

25  conditions in the pathology lab an adverse action, nor did we

1  discuss it at the pre-motion conference.  As such, Plaintiff was

2  not on notice of this deficiency.  Additionally, where, as here,

3  some of the complaint's defects are potentially curable, *Zucker*

4  *v. Five Towns College,* 2010 WL 3310698, on *3 (E.D.N.Y. Aug.

5  18th, 2010), the Court may exercise its discretion to grant

6  leave to amend.  *McCarthy v. Dun & Bradstreet,* 482 F.3d 184,

7  200.

8        Accordingly, on my own motion, I grant Plaintiff leave

9  to amend, if Plaintiff can do so in good faith, but only as to

10  the causal link between his complaints about the alleged

11  unsanitary conditions in the autopsy suite and the adverse

12  employment action on his New York Labor Law claims.

13        In conclusion, the motion to dismiss is granted in

14  part and denied in part.  The following claims are dismissed:

15  Plaintiff's breach of contract claims against HCC and

16  Plaintiff's 741 claim against Dr. Islam; Plaintiff's 215, 740,

17  and 741 retaliation claims, based on his complaints about

18  unsanitary conditions, are also dismissed, but with leave to

19  amend.

20        The case will go forward on the following claims:

21  Plaintiff's breach of contract claim against PC and Dr. Islam on

22  grounds of withholding his bonus and assigning him to work on

23  adult pathology cases and Plaintiff's 215 and 740 claims against

24  all Defendants with respect to his complaints about the

25  withholding of his bonus and assigning him to adult pathology

1   cases, as well as his 741 claim against PC and HCC based on the

2   assignment to adult cases.  The Clerk is to terminate ECF no.

3   22.

4           And now we have to set a schedule for amendments and

5   answer.

6           When -- I assume you'll want to get the transcript,

7   Mr. Jeziorkowski, and you need to figure out if you can amend in

8   good faith.  How long do you think it will take you to do that?

9           MR. JEZIORKOWSKI:  That's correct, your Honor.

10  Depending on how quickly we can obtain the transcript, to confer

11  with the client and make sure we can amend in good faith, I'd

12  ask the Court for three weeks.

13          THE COURT:  All right, that looks doable.  The court

14  reporter is nodding, okay, so three weeks from today would be

15  June -- July 17th.

16          MR. JEZIORKOWSKI:  Without any pressure on the court

17  reporter of course, your Honor.

18          THE COURT:  Well, you could get it tomorrow if you

19  paid enough, but you don't need to do that.

20          All right, and then the only real thinking Defendants

21  will have to do is whether the amended claims they want to move

22  to dismiss again, so is the customary three weeks sufficient for

23  that?

24          MR. SCHUDROFF:  Your Honor, would --

25          THE COURT:  For the answer or another pre-motion

1  letter?

2          MR. SCHUDROFF:  Yes, your Honor, three weeks following

3  the 17th would be fine.

4          THE COURT:  Okay.  Let me just make sure I'm right

5  here.  One, two, three weeks, August 7th.

6          If Defendant answers, then what I think I'll do is,

7  Mr. Clark will send you one of my blank case management plans

8  today and assuming Defendants answer on August 7th, then return

9  it to the Court, hopefully agreed upon, by August 14th.

10         If the Defendants submit another pre-motion letter on

11 August 7th, we'll have another conference, but it seems to me,

12 if Plaintiff can specify the -- when he made complaints about

13 the lab closely enough to give rise to the inference based on

14 temporal proximity, then there would be no point in making

15 another motion.

16         Let's go off the record for a second.

17         (Discussion off the record)

18         THE COURT:  Let's go back on the record.

19         I'm encouraging the parties to put behind them

20 whatever may have occurred now and try to talk again about

21 resolving the case.  At the same time, we have a schedule,

22 second amended complaint by July 17th.

23         If there's no second amended complaint -- well,

24 whether there is or isn't...sorry.  If there is a second amended

25 complaint by July 17th, Defendants will answer or submit another

1  pre-motion letter by August 7th.  If there's no second amended

2  complaint by July 17th, Defendants will answer by August 8th.

3  Excuse me, August 7th.  And if they answer, the parties will

4  return the proposed case management plan, hopefully agreed upon,

5  and if there is a pre-motion letter, we'll have another

6  conference, but at that time, I would probably start discovery

7  anyway because we know there are numerous claims going forward.

8            All right, anything else we should do this morning?

9            MR. JEZIORKOWSKI:  I don't think so, your Honor.

10           MR. SCHUDROFF:  No, your Honor.

11           THE COURT:  All right, thank you, all.

12           And if you think it would be helpful for a magistrate

13 judge or a mediator to get involved, let me know and I'm happy

14 to refer you.

15           MR. JEZIORKOWSKI:  Thank you, your Honor.

16           MR. SCHUDROFF:  Thank you, your Honor.

17           Certified to be a true and accurate transcript.

18

19           _____

20           TABITHA DENTE, RPR, RMR, CRR

21           OFFICIAL COURT REPORTER

22

23

24

25